United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

USA,

                Plaintiff,

      v.

RYAN FLOYD,

                Defendant.

Case No.  13-cr-00639-WHO-1

**ORDER DENYING MOTION TO SUPPRESS**

Re: Dkt. No. 20

## INTRODUCTION

Defendant Ryan Floyd seeks to suppress the search of a cave in Humboldt County, California that netted 99 firearms because the Humboldt County Sheriff's Office (HCSO) lacked a reasonable suspicion to execute a probation search of the cave and further lacked a reasonable suspicion that Floyd owned the property where the cave was located.  This is a close case, made murkier by deficiencies in the government's arguments and evidence.  I find, however, that the anonymous tip received by the HCSO provided sufficient suspicion to initiate the search and to seize the guns in the cave.  Floyd's motion to suppress is DENIED.

## BACKGROUND

Floyd was a suspect in several burglaries and vehicle thefts in southern Humboldt County. On February 4, 2013, the HCSO received an anonymous tip that Floyd had "20-30 assault style rifles" and "several fully automatic firearms," as well as "numerous amounts of methamphetamine and cocaine."  Dkt. No 21-1 at 8.  The tipster also told the HCSO that there were ten to twelve stolen vehicles parked at Floyd's residence.  *Id.*

On February 7, 2013, the HCSO executed a probation search on the real estate parcel that includes Floyd's residence (the "residential parcel").  It found large amounts of marijuana, heroin, and methamphetamine, thirty-six "metal army style ammunition containers," each filled with

United States District Court
Northern District of California

1  "hundreds of rounds of ammunition," a number of stolen cars, and other contraband.  Dkt. No. 21-

2  1 at 13-16.  The HSCO did not find the firearms described by the anonymous tipster.  Floyd was

3  on the property at the time of the search.  He was arrested, transported to the Humboldt County

4  Correctional Facility, and booked on various charges.  *Id.* at 22.

5       On February 10, 2013, the HCSO received another anonymous tip regarding Floyd.  The

6  notes taken by the deputy who took the call state:

7       There is a cave on the Ryan Floyd property that was not searched.

8       The cave is 200 yards above the pond.

9
10       There is a road that goes from the house to the pond, when you make the turn to
     the right to go down to the pond there's a rock formation on the LHS behind the
11       school buses.  Behind the rock formation there is a depression and that's where
     the cave is.

12
13       You will be able to see the cave if you look towards the old Roy Finch cabin if
     you have your back to the rock formation.

14       RP says there are more guns in the cave and other old family possessions that
     belonged to Ryan's father Wallace Floyd.
15

16       Dkt. No. 21-1 at 39.

17       The next day, HCSO deputies obtained a search warrant.  *See* Dkt. No. 33 at 3-4.  The

18  warrant does not mention the cave or the anonymous tip and seeks "any stolen property."  *Id.*  It

19  identifies only the residential parcel, not the adjacent parcel, number 223-091-014-000 ("parcel

20  014").  *Id.*  On February 12, 2013, HCSO deputies started a search of the residential parcel,

21  followed the anonymous tipster's directions, and found the cave and the arsenal of weapons.  Dkt.

22  No. 21-1 at 35.

23       The cave is not located on the residential parcel.  The parties agree that it is on parcel 014.

24  Parcel 014 was once owned by Roy Fitch, who granted Redwood Community Radio, Inc. and

25  Floyd's father an interest in the parcel "as joint tenants" with him pursuant to a Gift Grant Deed

26  that was recorded in 2003.  Dkt. No. 42-1 at 533.  Both Fitch and Floyd's father died prior to the

27  relevant events here.  Dkt. Nos. 44-3, 44-4.  Floyd was his father's only heir and inherited all of

28  his father's property.  Dkt. No. 43 ¶ 2.  In 2013, Redwood Community Radio, Inc. and Floyd, as

2

1    the administrator of his father's estate, conveyed their interest in parcel 014 to Cody Eldridge.

2    Dkt. No. 42-1 at 546-48.  Floyd did not execute the deed to Eldridge until February 27, 2013, 15

3    days after the search of the cave.  Dkt. No. 42-1 at 548.

4         As a result of the February 12, 2013 search, Floyd was indicted as a felon in possession of

5    firearms on September 26, 2013, in violation of 18 U.S.C. § 922(g)(1).  His motion to suppress

6    was argued on December 4, 2014.

7                                            **DISCUSSION**

8    **I.        FLOYD HAS STANDING TO MOVE TO SUPPRESS THE SEARCH**

9         The government contends that Floyd did not own parcel 014, where the cave is located,

10   and that as a result he lacks standing to complain that the search was illegal.  Floyd has the burden

11   of showing that he had a reasonable expectation of privacy in the place searched.  *Rakas v. Illinois*,

12   439 U.S. 128, 148-49 (1978).  I find that Floyd has satisfied this burden, and that he has standing

13   to challenge to the government's search of the cave.

14       The government initially based its argument on a declaration from a Federal Bureau of

15   Investigation agent who established that the cave was on parcel 014 and declared:

> The location [of the cave is] is not on Ryan Floyd's property . . . The raw
> coordinates . . . place it 60 feet outside the Floyd parcel boundaries . . . The
> records I have reviewed show that parcel [014] was owned by Roy Fitch in a joint
> or shared trust shared with Redwood Community Radio Inc., until Fitch died in
> 2011.  When Fitch died, ownership of the parcel passed to Redwood Community
> Radio, Inc., which held the property until February 6, 2013, when it was sold to a
> Cody Eldridge.  The sale was recorded on March 22, 2013.

21   Collar Decl. ¶¶ 4-5 (Dkt. No. 35-1).  The declaration did not explain the basis for the agent's

22   opinion, which turned out to be an on-line search of one database.  Dkt. No. 44 at 3-4.  That is a

23   slender reed for his sweeping conclusion on such a critical fact.

24       While it is undisputed that the cave is on parcel 014, everything else the agent declared is

25   either wrong or open to question.  Record title shows that as a result of the 2003 Gift Grant Deed,

26   Fitch, Redwood Community Radio, Inc., *and Floyd's father* had an interest in the parcel "as joint

27   tenants" in 2003, and that the Floyd family's interest was not conveyed to Eldridge until *after* the

28   search.  Dkt. No. 42-1 at 533, 548.

United States District Court
Northern District of California

3

When confronted with this evidence, the government adjusted its argument to contend that

Floyd never had an interest in parcel 014 because his father's interest was extinguished on his

death.  Floyd's father was part of a joint tenancy, and joint tenancies typically require that a

deceased joint tenant's interest go to the remaining joint tenants, not to the decedent's heirs.

However, this purported joint tenancy included a corporation.  Dkt. No. 42-1 at 533.  Under

*DeWitt v. San Francisco*, 2 Cal. 289 (1852), which remains the only California Supreme Court

decision to squarely address the issue, a corporation cannot be a joint tenant because it can survive

indefinitely.  *See id.* at 297 ("Nor can a corporation hold lands as joint tenant with a natural

person, for there is no reciprocity of survivorship between them."); *see also,* 5 Miller & Starr,

California Real Estate § 12:22 (3d ed.) ("[A] corporation . . . probably cannot own property in

joint tenancy because a corporation's perpetual existence is contrary to the right of survivorship of

a joint tenancy."); 2 Patton and Palomar on Land Titles § 408 (3d ed.) ("A corporation can hold by

tenancy in common, but not as joint tenants, since survivorship rights would not apply.")

(footnotes omitted).   In 2011, a lawyer in Humboldt County made the same argument to First

American Title Company that the government advanced here.  *See* Dkt. Nos. 44-5, 44-6.  The

lawyer tried to convince the title company that after Fitch and Floyd's father died, only Redwood

Community Radio, Inc. held title to parcel 014.  *Id.*  The title company rejected the argument.

Accordingly, it was necessary for Floyd to transfer his father's estate's interest (actually, Floyd's

interest as his father's sole heir) in 2013 to effectuate the conveyance to Eldridge.  *See* Dkt. No.

42-1 at 548.

As a result, the government's argument that Floyd had no ownership interest in parcel 014,

and thus no standing to challenge the search, fails.  Floyd had an actual, beneficial, and/or putative

interest in parcel 014 and had a reasonable expectation of privacy to it.

He also had a subjective expectation of privacy to the contents of the cave.  His declaration

establishes that both he and his father kept the entrance to the cave hidden behind logs, rocks,

United States District Court
Northern District of California

brush and/or moss.  Dkt. No. 22, ¶¶s 4, 5.  Given these facts, Floyd has standing under the Fourth

Amendment to object to the search.

### III.    THE HCSO HAD SUFFICIENT CAUSE TO SEARCH THE CAVE UNDER THE TOTALITY OF THE CIRCUMSTANCES

At oral argument, the government wisely abandoned its initial argument that the search

warrant covered the search of the cave.  Given that the warrant identified the wrong real property,

is both vague and overbroad, and does not mention the cave, a search based on it would be

suppressed.  *See United States v. SDI Future Health, Inc.*, 568 F.3d 684, 701-02 (9th Cir. 2009);

*United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir. 1990) (to satisfy the Fourth Amendment's

Warrant Clause, a warrant must "describe the place to be searched or things to be seized with

sufficient particularity" and "be no broader than the probable cause on which it is based").

The government also asserts, more persuasively, that it had the right to a conduct a

warrantless search of the cave because Floyd was on probation at the time.  To justify a probation

search of Floyd, the government must establish that it had reasonable suspicion at the time of the

search to perform it, and probable cause to believe the property it entered to perform the search

belonged to Floyd.  *See United States v. Bolivar*, 670 F.3d 1091, 1095 (9th Cir. 2012); *Moreno v*

*Baca*, 431 F.3d 633, 639-41 (9th Cir. 2005); *United States v. Gomez*, No. 13-cr-00282-PJH, 2014

WL 1089288, at *14 (N.D. Cal. Mar. 14, 2014) (probation search conditions validate a search

"only if the police had advance knowledge that the search conditions applied before they

conducted the search").[1]

Floyd makes several arguments that the government lacked such justification:  (i) the

deputies did not know the specifics of Floyd's search condition in his Probation Order, and so did

---

[1] It is not clear that the government needed probable cause, as opposed to only reasonable
suspicion, to believe the property it entered (i.e., the cave) belonged to Floyd.  Under *Bolivar* and
other Ninth Circuit precedent, "[o]fficers must have 'probable cause' that they are at the correct
residence but, once validly inside, they need only 'reasonable suspicion' that an item is owned,
possessed, or controlled by the parolee or probationer."  670 F.3d at 1095; *see also, Motley v.*
*Parks*, 432 F.3d 1072, 1079-80 (9th Cir. 2005); *United States v. Davis*, 932 F.2d 752, 758 (9th Cir.
1991).  The cave, which was not being used as a living space, seems to fall somewhere between a
residence and a mere "item."  The parties do not squarely address which standard should apply.
For the purposes of this motion, I assume that the government must show that there was probable
cause to believe the cave was on Floyd's property.  Because I find that even this higher standard is
satisfied, the question of which standard applies is not material to resolution of the motion.

United States District Court
Northern District of California

1    not know if a warrantless search was proper; (ii) Floyd was in detention at the time of the search,

2    so the search condition should not apply; (iii) the government did not have a reasonable suspicion

3    to conduct the search because the anonymous tipster had not been shown to be reliable; and (iv)

4    the government did not have probable cause, or even a reasonable suspicion, to search property on

5    land it did not know to be Floyd's.  None of these contentions are persuasive.

6          First, two of the HCSO deputies who conducted the February 12, 2013 search of Floyd's

7    property, deputies Gomes and Moore, also participated in the February 7, 2013 probation search of

8    the property.  *See* Dkt. No. 21-1 at 13, 19, 27.  Moreover, Deputy Moore states in the probable

9    cause affidavit attached to the February 11 warrant that "Ryan Floyd is on felony probation with a

10   general search for H&S 11370.1."  Dkt. No. 40 at 4 of 17.  While the government did not obtain a

11   declaration from Gomes or Moore detailing what they knew about Floyd's search condition at the

12   time of the cave search, these facts indicate that the searching deputies were familiar with Floyd's

13   status as a probationer and the contours of his probation search condition.

14         Second, the fact that Floyd was in custody does not negate the HCSO's right to conduct a

15   probation search of Floyd's property.  Floyd's Probation Order states:  "Defendant shall submit his

16   person, real property, place of residence, vehicle and/or any other belongings to search and seizure

17   at any time of the day or night, with or without a search warrant, by a probation officer of other

18   law enforcement officer."  Dkt. No. 38 ¶ 12.[2]  The purpose of a probation search need not be

19   limited to ensuring compliance with probation conditions; the government may also search a

20   probationer to investigate criminal activity generally.  *See United States v. Knights*, 534 U.S. 112,

21   116-17 (2001); *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002); *see also, United States*

22   *v. King*, 736 F.3d 805, 809-10 (9th Cir. 2013) (noting that government's interests in probation

23   searches include "apprehending violators of the criminal law" and "discovering criminal activity

24   and preventing the destruction of evidence").  Given this acceptable purpose, a probationer's

25

26   [2] At oral argument, I allowed the government an extra week to authenticate what seemed clearly to
     be admissible records.  I expect to be lenient with an unrepresented party regarding the
27   presentation of evidence, but not members of the bar, and particularly not lawyers for the
     government.
28

1    custodial status does not automatically vitiate his probation search condition, in particular where

2    the contested search is conducted within days of the probationer being placed in custody.  The one

3    case cited by Floyd during oral argument, *Motley v. Parks*, 383 F.3d 1058 (9th Cir. 2004), does

4    not support his position and, in any event, was in large part overruled on rehearing en banc.  *See*

5    *Motley*, 432 F.3d at 1081.

6            Third, the anonymous tip on February 10, 2013 gave the HCSO reasonable suspicion to

7    conduct the search.  Reasonable suspicion "is a less demanding standard than probable cause not

8    only in the sense that reasonable suspicion can be established with information that is different in

9    quantity or content than that required to establish probable cause, but also in the sense that

10   reasonable suspicion can arise from information that is less reliable than that required to show

11   probable cause." *Alabama v. White,* 496 U.S. 325, 330 (1990).  "Reasonable suspicion . . . is

12   dependent upon both the content of information possessed by police and its degree of reliability.

13   Both factors – quantity and quality – are considered in the totality of the circumstances – the

14   whole picture that must be taken into account when evaluating whether there is reasonable

15   suspicion." *Id.*  (internal quotation marks omitted).  An officer has reasonable suspicion when he

16   "is aware of specific, articulable facts which, when considered with objective and reasonable

17   inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo,* 208

18   F.3d 1122, 1129 (9th Cir. 2000).

19           Courts look to several factors in determining whether an informant's tip is sufficiently

20   reliable to provide reasonable suspicion:

21           First, a known informant's tip is thought to be more reliable than an anonymous
22           informant's tip.  That is because an anonymous informant typically cannot be questioned
             about the basis for knowing the information or motive for providing the tip, nor can the
23           anonymous informant be held accountable for providing false information in violation of
             the law.  Second, an informant with a proven track record of reliability is considered more
24           reliable than an unproven informant.  Third, the informant's tip is considered more reliable
             if the informant reveals the basis of knowledge of the tip – how the informant came to
25           know the information.  Finally, a tip that provides detailed predictive information about
             future events that is corroborated by police observation may be considered reliable, even if
26           the tip comes from an anonymous source.  Predictive information that reveals a detailed
             knowledge of an individual's intimate affairs is more reliable than predictive information
27           that could be observed by the general public, and such self-verifying detail is considerably
28           more valuable if it relates to suspicious activities than if it relates to innocent activities.

United States District Court
Northern District of California

1    *United States v. Rowland*, 464 F.3d 899, 907-08 (9th Cir. 2006) (citations omitted); *see also,*

2    *Florida v. J.L.*, 529 U.S. 266, 270-74 (2000).

3              Under these factors, the February 10, 2013 anonymous tip falls towards the low end of the

4    reliability scale when viewed alone, out of context.  However, the context in which the tip was

5    made gives it the reliability necessary to provide reasonable suspicion.  *See White*, 496 U.S. at 330

6    ("[I]f a tip has a relatively low degree of reliability, more information will be required to establish

7    the requisite quantum of suspicion than would be required if the tip were more reliable.").  The

8    HCSO had recently received another anonymous tip that Floyd had 20-30 assault rifles, several

9    fully automatic firearms, and various other contraband on his property.  The probation search that

10   followed netted many thousands of rounds of ammunition and an impressive amount of stolen

11   property, controlled substances, and other contraband, but not the alleged firearms.  The fact that

12   this initial search discovered thousands of rounds of ammunition but no corresponding stockpile of

13   firearms adds substantial credibility to the tipster's description of a cave on Floyd's property

14   where guns were being stored.  The tipster also provided detailed directions to the cave and a

15   fairly specific description of its contents.  *See United States v. Reyes*, 792 F.2d 536, 539 (5th Cir.

16   1986) ("[T]he credibility of an informant's tip is strengthened if it is made in great detail, thus

17   evincing a strong basis for the informant's knowledge.").  Floyd argues that nothing about the

18   anonymous tipster's information demonstrates its reliability.  In a vacuum, he might have a point.

19   But considering the totality of the circumstances, the tip gave the HCSO sufficient cause to

20   execute the search.

21             Finally, the HCSO had probable cause to believe the cave was located on Floyd's property.

22   Again, this question is evaluated as of the time of the search, not in light of after-acquired

23   information.  *See Moreno*, 431 F.3d at 639-41; *Gomez*, 2014 WL 1089288, at *14.  At the time of

24   the search, what the deputies knew about the cave came from the tipster's information.  According

25   to the tipster, the cave was located on Floyd's property.  Dkt. No. 21-1 at 39.  It contained Floyd

26   family possessions in addition to the firearms.  *Id.*  The deputies received specific directions to the

27   cave.  *Id.*  And they also knew that the residential parcel contained 55 acres.  Dkt. No. 40 at 6.

28   What they did not know was that the cave was on parcel 014, approximately 60 feet from the

<div style="float:left; writing-mode:vertical">United States District Court<br/>Northern District of California</div>

1   residential parcel's border.  The record indicates that the HCSO did not obtain this information

2   until after the search had been completed.

3       Floyd argues that the deputies would have had to cross a barbed wire fence to get to the

4   cave, and that they should reasonably have assumed that the fence demarcated a property line.

5   Moreover, Floyd hypothesizes that because the government originally argued that Floyd did not

6   own parcel 014, the deputies must have believed that Floyd did not own the land where the cave

7   was located.  The latter hypothesis lacks support.  No declaration was obtained from the deputies

8   concerning their state of knowledge at the time of the search, but the record establishes that the

9   information they had concerning the cave would not have suggested that they should perform a

10  survey and title search prior to executing the search warrant – they were told the cave was on

11  Floyd's property and how to find it.

12      Assuming that Floyd is correct that the deputies had to cross the barbed wire fence, given

13  the specificity of the directions from the tipster, and his or her statements that the cave was on

14  Floyd's property and contained Floyd family property as well as the guns, the deputies had good

15  reason to locate and search the cave.  The deputies were not required, as they followed the tip's

16  specific directions, to call off their search for the cave to research whether the barbed wire fence

17  meant that the cave was not on Floyd's property, which was contrary to what they had been told.

18  Nor is there evidence that the deputies believed at the time that the barbed wire fence signaled that

19  the cave was located on a neighboring parcel.  Under the circumstances, the deputies had probable

20  cause to believe the cave was part of Floyd's property.

21                              **CONCLUSION**

22      Although Floyd has standing to move to suppress the search of the cave on February 12,

23  2013, the HCSO was entitled to perform a warrantless search on Floyd's property and had a

24  reasonable basis to search the cave.  The motion to suppress is DENIED.

25      **IT IS SO ORDERED**.

26  Dated: December 22, 2014

27



WILLIAM H. ORRICK
United States District Judge

28

9